Preiss v. Wine and Design Franchise, LLC, 2018 NCBC 86.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 11895

EMILY N. PREISS and WINE AND
DESIGN, LLC,

                    Plaintiffs,

v.

WINE AND DESIGN FRANCHISE,
LLC; HARRIET E. MILLS; PATRICK
MILLS; and CAPITAL SIGN
SOLUTIONS, LLC,

                    Defendants.

**OPINION AND ORDER ON
DEFENDANTS HARRIET E. MILLS,
PATRICK MILLS, AND CAPITAL
SIGN SOLUTIONS, LLC'S MOTION
TO ENFORCE SETTLEMENT
AGREEMENT**

THIS MATTER comes before the Court on Defendants Harriet E. Mills, Patrick Mills, and Capital Sign Solutions, LLC's ("the Mills Defendants") Motion to Enforce Settlement Agreement. ("Motion", ECF No. 83.) The Mills Defendants seek Court enforcement of a settlement allegedly reached between counsel for Defendants and counsel for Plaintiffs. With the Motion, the Mills Defendants filed several exhibits consisting primarily of settlement correspondence between counsel and versions of draft settlement agreements. (Mills Defendants' Br. Supp. Mot. to Enforce, ECF No. 84, Exhs.) Plaintiffs filed a response in opposition to the Motion, along with several exhibits, including emails and correspondence between counsel.[1] ("Pls.' Br. Opp. Mot. Enforce Settlement", ECF No. 102.)

---

[1] Neither party submitted their exhibits with affidavits or in a form that generally could be considered in deciding a motion for summary judgment. Nevertheless, since both parties request that the Court consider the exhibits, the Court will consider them. *Baker v. Bowden*, 2017 NCBC LEXIS 31, at \*7 (N.C. Super. Ct. April 3, 2017).

THE COURT, having thoroughly reviewed the Motion, the briefs filed in support of and in opposition to the Motion, the exhibits, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that the Motion to Enforce Settlement Agreement should be DENIED for the reasons stated below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. *Relationship between the Parties and the lawsuit*

1.  This case involves disputes between Plaintiff Emily Preiss ("Emily") and Defendant Harriet E. Mills ("Harriet"), the founders and owners of Wine and Design Franchise, LLC ("W&D").  In May of 2010, Emily and Harriet co-founded a studio in Raleigh, North Carolina and operated a "paint party business" under the name Wine & Design, with each woman owning 50% of the business.  (Compl., ECF No. 3, at ¶ 10.)  The business was a success, and in June 2011, Emily and Harriet organized W&D to franchise the concept to other locations.  (*Id.* at ¶ 14.)  Between 2011 and 2014, W&D acquired over 40 franchised locations along the East Coast.  (*Id.* at ¶ 16.)

2.  Beginning in the summer of 2013, the personal and professional relationship between Emily and Harriet deteriorated to a point where the two former friends could no longer operate W&D together.  (*Id.* at ¶¶ 17–25.)  Emily and Harriet, together with Harriet's husband Patrick Mills ("Patrick"), entered into negotiations to divide W&D between Harriet and Emily in a satisfactory manner.  Both Parties were represented by counsel in the negotiations.  (*Id.* at ¶¶ 27–29.)

3.  As a result of these negotiations, Emily and Harriet signed a set of documents collectively referred to in the Complaint as the "Restructure Agreement"

which gave Harriet 72% ownership in W&D and Emily 28% ownership in W&D. Emily also received 100% ownership in the Raleigh studio location, Plaintiff Wine and Design, LLC. (ECF No. 3, at ¶ 31.) As part of the Restructure Agreement, Harriet became the sole manager of W&D, and Emily's use of the "Wine and Design" trademark was restricted by a Trademark Licensing Agreement ("TLA"). (*Id.*)

4. This lawsuit is a result of continuing hostility and distrust between Emily and Harriet since they entered into the Restructure Agreement. Emily alleges that Harriet has mismanaged W&D, breached the Restructure Agreement and other agreements between the Parties, and breached fiduciary duties owed to Emily. Harriet claims Emily has violated the terms of the Restructure Agreement including the TLA, and that Emily's management of her studio location has damaged W&D's business reputation.

5. On October 18, 2017, Plaintiffs filed the Complaint in this action. On October 23, 2017, this case was designated a mandatory complex business case by the Chief Justice of the Supreme Court of North Carolina (Designation Or., ECF No. 1) and assigned to the undersigned (Assignment Or., ECF No. 2).

6. On May 15, 2018, Defendants filed the Motion. On May 22, 2018, the Court issued an Order expediting the briefing schedule for the Motion. (Order Exped. Br. Sch., ECF No. 92.) On May 30, 2018, Plaintiffs filed a brief in opposition to the Motion. (ECF No. 102.) On July 6, 2018, the Court heard oral argument on the Motion. (Notice of Hearing, ECF No. 109.)

*B. Settlement Negotiations*

7.      On April 26, 2018, Plaintiffs' counsel, R. Hayes Hofler ("Hofler"), sent an email to counsel for Mills Defendants, Gloria T. Becker ("Becker"), and counsel for W&D, A. Charles Ellis ("Ellis"), proposing "tentative" settlement agreement terms. (ECF No. 84, Exh. 1.)  The proposed terms included (1) a sum of money to be paid to Emily, (2) the assignment of 100% of the ownership interest in W&D to Emily, (3) terms assigning new rights with regard to the trademark and licensing of W&D that *inter alia*, required Emily to rename the Raleigh Studio, (4) a non-compete clause, and (5) a mutual release of claims.  (*Id.*)  The email also stated that Hofler would "send the proposed confidentiality, non-disclosure, and non-disparagement clause shortly." (*Id.*)

8.      Becker responded to Hofler on April 27, 2018, accepting the proposed tentative settlement terms on behalf of Mills Defendants, and acknowledging that the settlement documents would need to be drafted.  (ECF No. 84, Exh. 2.)

9.      On April 29, 2018, Hofler sent another email to Becker stating that "we have reached a settlement on the basic terms" and that Hofler "h[as] authorization [from Plaintiffs] to finalize the . . . agreement" terms as outlined in Hofler's initial email to Becker.  (ECF No. 84, Exh. 3.)

10.     On April 30, 2018, Hofler emailed to Becker and Ellis a draft written settlement agreement.  (*Id.*, Exh. 4.)  On May 1, 2018 Ellis sent to Hofler and Becker a revised proposed written settlement agreement.  (*Id.*, Exh. 5.)  Among other terms,

Ellis's proposed settlement agreement contained a "Confidentiality, Non-disclosure and Non-disparagement Agreement" that included the following as paragraph 9 (C):

> Permitted Response. If asked about any matters related to this Agreement or the dispute giving rise to it, by anyone to whom disclosure is not required by court order or as permitted by this Agreement, the only permitted response shall be that a dispute arose between the parties and the dispute has been resolved to the satisfaction of all concerned. In addition, Harriet and W&D Franchise are permitted to make a public statement that Harriet is now the sole owner of W&D Franchise; and Emmy is permitted to make a public statement announcing the new name of the Raleigh studio.

(*Id.*)

11. On May 2, 2018, Hofler sent to Ellis and Becker a "red-lined" version of Ellis's proposed written settlement agreement. (*Id.*, Exh. 6.) Among the changes Hofler made to Ellis's draft agreement was to strike through the following language in paragraph 9(C): "In addition, Harriet and W&D Franchise are permitted to make a public statement that Harriet is now the sole owner of W&D Franchise; and Emmy is permitted to make a public statement announcing the new name of the Raleigh studio." (*Id.*, Exh. 6.) In an email sent later on May 2, 2018, Hofler explained the revision as follows: "Emmy of course will have to state the new name of the Raleigh studio when she opens under that name, but any statement that Harriet is the sole owner of [W&D] potentially violates the non-disparagement clause – opens the door to Harriet explaining why she is the new owner." (*Id.*, Exh. 8.)

12. On the morning of May 3, 2018 Becker and Ellis responded to Hofler's proposed revision to paragraph 9(C) contending that Harriet must be allowed to publicly announce that she is sole owner of W&D, and that paragraph 9(C) "should

not be modified." (ECF No. 83, Exhs. 11 and 12.) At 11:58 a.m. on May 3, 2018 Hofler responded to Becker and Ellis. (*Id.*, Exh. 13.) While Hofler stated "I think we have an agreement," he did not accept the exact terms of the settlement agreement as drafted. Hofler made the following counterproposal regarding paragraph 9(C): "Regarding public announcement of the change in status of the business, there should be only one public announcement by both parties, which can be used repeatedly as circumstances warrant, but the public announcement must be approved in advance." (*Id.*)

13.     In their communications regarding settlement, the Parties also agreed that in order to have a final settlement, Emily would have to sign a written settlement agreement and the Court would have to approve the settlement. (ECF No. 83, Exhs. 7, 9, 11, 16, and 17.) For example, on May 2, 2018 Hofler stated in an email to Becker and Ellis that "we must have court approval of the settlement." (*Id.*, Exh. 9.) On May 3, Becker emailed Hofler and Ellis stating ""In light of our history, we will need the signed settlement agreement before we can represent to the court we have settlement." (*Id.*, Exh. 11.)

14.     At 3:02 p.m. on May 3, 2018, Ellis sent an email to Hofler and Becker stating that "[i]n anticipation that we have a final agreement, I am attaching herewith the finalized version of the Settlement Agreement." (*Id.*, Exh. 14.) Despite Hofler's proposal for an agreed-upon public announcement, the settlement agreement sent by Ellis contained the original, unmodified language in paragraph 9(C)

permitting each party to make their own announcement as it existed in the draft sent on May 1, 2018. (*Id.*)

15. Despite the continuing communications between counsel for the Parties over the terms of the settlement, on May 3, 2018, Hofler called the Court to inform the law clerk assigned to this case, Grace Gregson ("Law Clerk"), that a settlement had been reached by the Parties that would require Court approval. (G. Gregson email, ECF No. 84, Exh. 10.) Following the phone call, the Law Clerk sent an email to counsel for the Parties asking for confirmation that they had reached a "full, final, and enforceable settlement of the matter, . . ." and inquiring "whether there is a currently signed settlement agreement between the Parties that contains the complete terms of the [ ] settlement[.]" (*Id.*) Becker responded to Gregson's email by stating that "[w]hile we are working towards a settlement, we are waiting to hear back from [Hofler] on an essential term and thus there is no settlement at this time." (ECF No. 102, Exh. D.) Hofler's response to the Law Clerk's email did not confirm the final settlement, but rather, equivocated, stating that while a full, final, and enforceable settlement "is all we want," the Parties still had "two small parts of the over-all agreement which will be quickly cleared up." (*Id.*) Ellis did not respond to the Law Clerk's email.

16. On the morning of May 4, 2018, Becker emailed the written settlement agreement to Hofler with Defendants' signatures, and sought Plaintiffs' signatures. (ECF No. 83, Exhs. 15 and 16.) Hofler responded in an email to Becker and Ellis stating that he had "emailed the final settlement agreement to [Emily] and her father

and asked them to review it and [Emily to] sign it. (*Id.*, Exh. 17.) In the email, Hofler also stated that "[e]ven if [Emily] signs the Agreement, I want her on the witness stand to testify that she has signed it willingly and with understanding of what she has signed, without coercion, etc." (*Id.*)

17. At 12:25 p.m. on May 4, 2018, Hofler emailed Becker and Ellis to inform them that Emily would not sign the written settlement agreement and now had "other items" she wanted as part of the settlement. (*Id.*, Exh. 18.)

18. On May 8, 2018, Hofler forwarded the list of additional terms requested by Emily to Becker and Ellis, all of which were either subsumed by the terms proposed in Hofler's April 26 email to Becker or were entirely new to the negotiations that had been conducted between counsel since April 27. (ECF No. 102, Exh. G.) Following this email, all further settlement communications broke down. The Motion was filed shortly thereafter.

## II.    ANALYSIS

19. "[A] party has two options in deciding how to specifically enforce the terms of the settlement agreement." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 708, 682 S.E.2d 726, 741 (2009) (quotation marks omitted). A party may "(1) take a voluntary dismissal of his original action and then institute a new action on the contract, or (2) seek to enforce the settlement agreement by petition or motion in the original action." *Estate of Barber v. Guilford Cty. Sheriff's Dep't*, 161 N.C. App. 658, 662, 589 S.E.2d 433, 436 (2003) (emphasis omitted); *see also DeCristoforo v. Givens*, 2015 NCBC LEXIS 56, at *19 (N.C. Super. Ct. May 29, 2015) ("[A] party may

enforce a settlement agreement by filing a voluntary dismissal of its original claim and then instituting another action on the contract, or it may simply seek to enforce the settlement agreement by petition or motion in the original action." (quotation marks and emphasis omitted)). When a party seeks to enforce the settlement agreement by motion in the original action, the motion is treated as a motion for summary judgment. *Hardin*, 199 N.C. App. at 694-95, 682 S.E.2d at 732-33; *Ray Lackey Enters., Inc. v. Vill. Inn Lakeside, Inc.*, 2016 NCBC LEXIS 9, at *7 (N.C. Super. Ct. Jan. 29, 2016) (citing *Hardin*).

20.    "Summary judgment is appropriate when 'there is no genuine issue as to any material fact' and 'any party is entitled to a judgment as a matter of law.'" *Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c)). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). The Court must view the evidence in the light most favorable to the non-movant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835.

21.    "A settlement agreement is a contract governed by the rules of contract interpretation and enforcement." *Williams v. Habul*, 219 N.C. App. 281, 289, 724 S.E.2d 104, 110 (2012) (citing *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000)).

In the formation of a contract an offer and an acceptance are essential elements; they constitute the agreement of the parties. The offer must be communicated, must be complete, and must be accepted in its exact terms. Mutuality of agreement is indispensable; the parties must assent to the same thing in the same sense, *idem re et sensu*, and their minds must meet as to all the terms.

*Dodds v. St. Louis Union Trust Co.*, 205 N.C. 153, 156, 170 S.E. 652, 653 (1933) (internal citations omitted); *see also Washington v. Traffic Markings, Inc.*, 182 N.C. App. 691, 697, 643 S.E.2d 44, 48 (2007) (quoting *Dodds*). "For an agreement to constitute a valid contract, the parties' minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (internal quotation marks and citations omitted). "To determine whether mutual assent exists, a court considers the parties' words and acts from the perspective of a reasonable person." *Baker v. Bowden*, 2017 NCBC LEXIS 31, at *9 (N.C. Super. Ct. Apr. 3, 2017) (citing *Howell v. Smith*, 258 N.C. 150, 153, 128 S.E.2d 144, 146 (1962)).

22. "Generally, a party seeking to enforce a contract has the burden of proving the essential elements of a valid contract[.]" *Se. Caissons, LLC v. Choate Constr. Co.*, 247 N.C. App. 104, 110, 784 S.E.2d 650, 654 (2016) (quoting *Orthodontic Ctrs. of Am., Inc. v. Hanachi*, 151 N.C. App. 133, 135, 564 S.E.2d 573, 575 (2002)) (quotation marks omitted).

23. Defendants have failed to carry their burden of establishing that there is no genuine issue of material fact and that the Parties reached a final and binding settlement agreement. Although the Parties expressed their agreement to various

settlement terms at different times in their negotiations, they never mutually assented to the same set of final settlement terms.

24.     The key communications between the Parties occurred between May 1 and May 4, 2018.   On May 1, 2018, Ellis sent a proposed written settlement agreement to Hofler.   The written settlement agreement constituted an offer by Defendants to Plaintiffs. Hofler's red-redlined version of the written settlement agreement sent back to Ellis and Becker on May 2 was a counteroffer, seeking to remove certain language from paragraph 9(C) permitting Harriet and Emily to make separate public announcements regarding the new ownership structure of W&D and the renaming of the Raleigh studio.   On May 3, 2018, Becker and Ellis rejected Hofler's counteroffer and instead renewed their May 1, 2018 offer retaining the original language in paragraph 9(C).   (ECF No. 84, Exhs. 11 and 12.)   Hofler responded to this proposal stating "I think we have an agreement," but he also proposed that the Parties resolve the dispute over paragraph 9(C) by agreeing to a joint public announcement subject to pre-approval by the Parties.   This varied the terms in Defendants' offer, and as such it constituted a rejection and counteroffer. *Ray Lackey Enters., Inc. v. Vill. Inn Lakeside, Inc.*, 2016 NCBC LEXIS 9, *14 (N.C. Super. Ct. Jan. 19, 2016) (holding that an acceptance that purports to alter the terms of an offer is a counteroffer and amounts to a rejection of the original offer) (citing *Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985)).

25.     Defendants sent the settlement agreement back to Hofler with signatures, retaining the original language in section 9(C), thereby rejecting Hofler's

counteroffer for a settlement agreement containing a requirement in section 9(C) for a joint public statement subject to pre-approval by the Parties. Plaintiffs refused to sign the settlement agreement containing this language. (ECF No. 84, Exh. 18.) No further negotiations took place. The Parties never mutually assented to the final terms regarding a public announcement of the new ownership structure W&D and the renaming of the Raleigh studio. *See Washington v. Traffic Markings, Inc.*, 182 N.C. App. at 697, 643 S.E.2d at 48.

26. In addition to the disputed terms regarding the public announcement, the Parties made clear that they each considered Emily's signature on a written settlement agreement to be an essential term of a final settlement. The failure to obtain Emily's final signature is fatal to the enforcement of the settlement. *Se. Caissons, LLC v. Choate Constr. Co.*, 247 N.C. App. 104, 113, 784 S.E.2d 650, 656 (2016) ("Although the purpose of a signature is to show assent, assent may be shown where the party who failed to sign the writing accepted its terms and acted upon those terms. . . . However, if under the circumstances the parties are merely negotiating while trying to agree on certain terms and the parties are looking to a writing to embody their agreement, no contract is formed until the writing is executed and . . . the offeree's acceptance is properly communicated to the offeror.") (citation omitted); *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) ("[I]f negotiating parties impose a condition precedent on the effectiveness of their agreement, no contract is formed until the condition is met. Likewise, when negotiating parties make it clear that they do not intend to be bound by a contract

until a formal written agreement is executed, no contract exists until that time.") (citation omitted).

27.    Finally, the Parties also repeatedly stated their positions that any final settlement agreement had to be approved by the Court.  The Court did not approve a final settlement agreement.

28.    The facts before the Court fail to establish that Defendants and Plaintiff reached a final settlement of all claims and issues.  Rather, Defendants varied Plaintiffs' last offer by failing to accept Plaintiffs' proposal that the Parties agree on a joint public announcement regarding the ownership of W&D, and Plaintiffs did not accept Defendants' final draft settlement agreement.  In addition, Emily did not sign the settlement agreement, and it was not approved by the Court.  The Motion should be DENIED.

## III.    CONCLUSION

THEREFORE, IT IS ORDERED that the Mills Defendants' Motion to Enforce Settlement Agreement is DENIED.

SO ORDERED, this the 20th day of August, 2018.


 /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases